### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MELODY DABROWSKI,<br><br>     Plaintiff,<br><br>   v.<br><br>ALEJANDRO MAYORKAS,<br>Secretary of Homeland Security<br><br>     Defendant. | Civil Action No. 19-3679 (BAH)<br><br>Chief Judge Beryl A. Howell |

### MEMORANDUM OPINION

Plaintiff Melody Dabrowski claims that her employer, the Department of Homeland Security ("DHS"), denied her transfer request to the New York Field Office of U.S. Immigration and Customs Enforcement ("ICE") to be closer to her ailing father, due to intentional discrimination—based on her being a woman of mixed Italian and Irish origin, only 42 years old at the time of the requested transfer, with one parent who died of cancer and another suffering from dementia and respiratory failure—in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Genetic Information Nondiscrimination Act of 2008 ("GINA"), 42 U.S.C. § 2000ff *et seq. See* Compl. & Demand Jury Trial ("Compl.") ¶¶ 19–33, 37, 42, 47, ECF No. 1.  Following more than ten months of discovery, defendant now seeks summary judgment, pursuant to Federal Rule of Civil Procedure 56(a).  Def.'s Mot. Summ. J. ("Def.'s Mot."), ECF No. 28.  For the reasons explained below, defendant's motion is granted.

### I.  BACKGROUND

The factual background underlying the instant motion falls into four categories: (1) the ICE policies governing the type of compassionate or hardship transfer at issue in this case, and

the extent to which they applied to plaintiff; (2) plaintiff's request for a hardship transfer to be nearer her father during his illness, and the eventual denial of such request—the basis of this suit; (3) the transfers granted to five other ICE employees, whom plaintiff proffers as comparators to support her discrimination claims; and (4) procedural history of this litigation.  These topics are addressed *seriatim*.

### A.     ICE's Hardship Transfer Policies and Practices

On November 30, 2004, ICE issued a written policy entitled "Hardship Review Board Policy for All Law Enforcement Officers Covered Under a Mobility Policy in the Office of Investigations and the Office of Professional Responsibility" ("Hardship Policy") which allows law enforcement officers to request an office transfer due to "hardships resulting from geographical assignments."  Def.'s SMF ¶ 11-12, ECF No 28-1; *id.*, Ex. 3, Hardship Policy ¶ 1, ECF No. 28-5.  That policy remained in effect at the time of the events giving rise to this suit. *See* Def.'s SMF ¶ 11.  This policy gives law enforcement officers the right to request a hardship transfer, but the grant of such transfer is discretionary since "the needs of the agency must remain paramount."  *See* Hardship Policy ¶ 1.2 (noting that "[h]ardship relocations are not entitlements").  The parties do not dispute that at the time plaintiff applied for the transfer at issue in this litigation, she was not serving in a law enforcement officer position covered by the Hardship Policy.  Def.'s SMF ¶ 13; Pl.'s Resp. SMF ¶ 13, ECF No. 29-1.

The parties dispute whether ICE had a similar policy or practice—written or unwritten— to accommodate compassionate or hardship transfer requests from employees who, like plaintiff, were *not* law enforcement officers.  Defendant denies that ICE had "a policy or process in place" for such requests, Def.'s SMF ¶ 11, and asserts that the Hardship Policy "superseded 'all legacy Immigration and Naturalization Service [("INS")] policies and practices relating to compassionate transfers,'" *id.* ¶ 12 (quoting Hardship Policy ¶ 3) (referring to ICE's predecessor

2

agency).  Plaintiff asserts that "although ICE did not have a written compassionate/hardship transfer policy for employees who were not law enforcement officers, it nevertheless considered and approved compassionate and/or lateral transfer requests from such employees."  Pl.'s Resp. SMF ¶¶ 11–12.  Plaintiff further asserts that at all relevant times, a 2002 INS compassionate transfer policy (the "Legacy Policy") remained in effect.  Def.'s SMF, Ex. 6, Pl.'s Answers Def.'s First Set Interrogs. ("Interrogs.") at 10, ECF No. 28-8.[1]

### B.    Plaintiff's Transfer Request

Plaintiff, a woman of Irish and Italian descent born in 1969, Def.'s SMF ¶¶ 1–2, 22, has worked in various positions within ICE and the federal government.  Plaintiff worked as a Detention and Removal Assistant for INS—which position transferred to the Bureau of Immigration and Customs Enforcement (ICE's original name)—from 2001 to 2005, when she joined the U.S. Secret Service as an Investigative Assistant.  Def.'s SMF ¶¶ 3–4; *id.*, Ex. 2, Pl.'s Resume at 2–3, ECF No. 28-4.[2]  In 2009, she returned to ICE as an Immigration Enforcement Agent in New York.  Def.'s SMF ¶ 5; Pl.'s Resume at 1–2.  In 2010, plaintiff was promoted to work as a Criminal Research Specialist at the Human Smuggling and Trafficking Center operated by ICE's Homeland Security Investigations ("HSI") component, Def.'s SMF¶ 6; Pl.'s Resume at 1, a position that required her to relocate to Washington, D.C.—a job requirement she knew about when she applied, *id.* ¶¶ 6–7.

---

[1]    The parties have not provided a copy of the Legacy Policy cited by plaintiff, other than a purported quotation of less than one sentence in her Complaint.  *See* Compl. ¶ 25. Thus, to the extent this policy existed in any form, the record is not clear how its terms materially differ from the Hardship Policy.

[2]    Plaintiff also uses the term "Deportation and Parole Clerk" to describe her first government position, Compl. ¶ 19, though the parties indicate no dispute of material fact about the specific title.

In 2011, when plaintiff was 41 or 42 years old, she sought to relocate to New York City to be closer to her father, who had declining health.[3]  Specifically, on July 7, 2011, she queried, via email, HSI's Acting Unit Chief, Dianne Sutton, about the protocol for requesting a hardship transfer.  Def.'s SMF ¶ 14; *id.*, Ex. 4, Email from Melody Dabrowski to Dianne Sutton (July 7, 2011), ECF No. 28-6.  After asking her colleagues about the relevant policies, Ms. Sutton informed plaintiff that "there is no hardship policy for non 1811 (Criminal Investigator) employees" but encouraged plaintiff to apply for vacant Intelligence Research Specialist positions in New York.  Def.'s SMF ¶¶ 15–16; *id.* Ex. 5, Email from Dianne Sutton to Melody Dabrowski (July 14, 2011), ECF No. 28-7.  Plaintiff never applied for these vacant positions but instead chose to pursue a hardship or compassionate transfer despite being advised that she was not covered by the formal Hardship Policy.  Def.'s SMF ¶ 17-18.  Plaintiff asserts that "she submitted her transfer request not under the Hardship Policy but under" the Legacy Policy, "following the advice of former supervisors."  Pl.'s Resp. SMF ¶ 18.

On August 1, 2011, plaintiff sent HSI Supervisory Intelligence Officer Nakeshia Lewis, via email, her request for a compassionate transfer, along with a memorandum explaining that she was of Italian and Irish origin, that her mother had died from pancreatic cancer seven years prior, and that her father was 90 years old.  Def.'s SMF ¶¶ 19, 22; *id.*, Ex. 7, Memorandum from Melody Dabrowski to Compassionate Transfer Review Committee at 1 ("Compassionate Transfer Req.") (Aug. 1, 2011), ECF No. 28-9.[4]  She further detailed her father's serious medical

---

[3]        The record does not provide plaintiff's date of birth, only that she was born in 1969.  Def.'s SMF ¶ 2. Since the events at issue in this case took place in 2011, plaintiff was 41 or 42 years old at the time, depending on when in 1969 she was born.

[4]        Defendant asserts that decision-makers evaluating plaintiff's request were not informed of plaintiff's father's age, Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.") at 19, ECF No. 28, but this is incorrect since this information was included in her transfer request, Compassionate Transfer Req. at 2 ("Since February 2011 *my ninety year old father* has been hospitalized several times with pneumonia as well as a severe hematoma requiring a blood transfusion." (emphasis added)).

conditions, including dementia and a lung disorder, the latter of which at one point necessitated that he be placed on life support.  Def.'s SMF ¶¶ 20–22; Compassionate Transfer Req. at 2–3.  In further support of her compassionate transfer request, plaintiff submitted two doctor's notes regarding her father's health.  Def.'s SMF ¶ 23; Compassionate Transfer Req.[5]

On August 31, 2011, Ms. Lewis sent plaintiff's compassionate transfer request to William Duda and Scott Hatfield, plaintiff's first- and second-line supervisors, respectively, Def.'s SMF ¶¶ 9, 26, both of whom "concurred with" the transfer request, *id.* ¶ 26; *id.*, Ex. 19, Emails between Scott Hatfield and William Duda (Sept. 8, 2011), ECF No. 28-21.  Ms. Lewis then informed plaintiff, on September 8, 2011, that her transfer request had been submitted "for final approval and a NY location determination."  Def.'s SMF ¶ 28 (quoting Def.'s SMF, Ex. 21, Email from Nakeshia Lewis to Melody Dabrowski (Sept. 8, 2011), ECF No. 28-23).  Plaintiff's application, which included a copy of her resume, her Fiscal Year 2011 mid-year performance review, and a copy of her transfer request, was subsequently forwarded up the chain of command at HSI New York until reaching the local Field Office's Special Agent in Charge ("SAC"), James Hayes.  Def.'s SMF ¶¶ 30–31 (citing various emails).  Meanwhile, in October 2011, during the pendency of plaintiff's transfer request, plaintiff was promoted to the position of Intelligence Research Specialist, though her core duties and geographical assignment remained the same.  *Id.* ¶ 29; *id.*, Ex. 16, Dep. of Melody Dabrowski ("Dabrowski Dep.") at 40:17–20, ECF No. 28-18.

---

[5]     One physician's note, dated July 26, 2011, stated: "[Melody Dabrowski] needs to take time off from work to attend the needs of her ill father, Frank Materezzo.  Mr. Materezzo has severe dementia and heart disease.  He is not able to take care of himself or make any decisions on his own.  He was hospitalized recently, and is presently in a nursing home setting."  Compassionate Transfer Req. at 6.  The second physician's note, dated July 20, 2011, said: "This letter serves to confirm that Frank Materezzo father of Melody Dubrowski [sic] has been admitted to New York Center for Rehabilitation and Nursing Care Center . . . . [F]amily involvement is essential at this time."  *Id.* at 7.

On October 20, 2011, Mr. Hayes denied plaintiff's request on the grounds that she lacked a performance record, Def.'s SMF ¶ 33; *id.*, Ex. 12, Email from James Hayes to Glenn Sorge (Oct. 20, 2011), ECF No. 28-14, though her performance review had been included in the compassionate transfer request packet sent to him. After being provided again with a copy of plaintiff's performance record, where she had received top marks and positive feedback, Mr. Hayes again denied plaintiff's request, on November 16, 2011, without further written explanation. Def.'s SMF ¶¶ 34-36 (citing various emails). In a later deposition, Mr. Hayes testified he denied the application on the grounds that: (1) plaintiff did not demonstrate a need to relocate to New York permanently, (2) plaintiff's numerous positions in a short period of time reflected a "stable but transient" work history, and (3) his office did not at that time have a need for intelligence analysts to support its mission. *Id.* ¶¶ 42-44; *id.*, Ex. 17; Deposition of James Hayes ("Hayes Dep.") at 34:6–35:9, 49:13–50:5, ECF No. 28-19. Plaintiff casts a different interpretation of the denial of her transfer request, asserting that Mr. Hayes discriminated against her based on sex, due to his purported animus towards women; on genetic information, because her family medical history could allow inferences about her genetic predispositions; and based on age and national origin, by way of "assum[ption]." Def.'s SMF ¶¶ 39–41; Dabrowski Dep. at 67:17–24, 95:14–97:2, 98:2–5, 104:17–23; 106:9–14.

### C.   Other ICE Employees' Transfer Requests

Plaintiff has proffered, as comparators, some information regarding five successful transfer requests granted to non-law enforcement personnel within ICE, including one to ICE's New York Field Office, which transfers plaintiff believes bolster her claim of intentional discrimination. First, in January 2012, a White female Senior Intelligence Research Specialist, who was born in 1957—thus more than a decade older than plaintiff—requested and received a compassionate transfer request to the New York City office, enabling this person to move closer

to her ailing sister and mother.  Def.'s SMF ¶ 37.  Mr. Hayes granted this request, indicating he was "[h]appy to help."  *Id.*  When asked why plaintiff was not afforded similar treatment, Mr. Hayes explained that the Senior Intelligence Specialist came "highly recommended" by the Philadelphia SAC in a personal call and had a "very detailed resume with references, very detailed training, [and] experience supporting a SAC office." *Id.* ¶¶ 45–46; Hayes Dep. at 52:10–19.  Though plaintiff received a five out of five on her performance review, the review acknowledged plaintiff's "limited experience" and suggested that her skill set was still in development.  *Id.* ¶¶ 32, 34 ("I am confident that upon completion of [certain trainings], she will be ready to move forward to greater [sic] assist the Center in our mission.").

Plaintiff also points to four other employees who also were not law enforcement officers but were nonetheless effectively granted compassionate transfers by officials other than Mr. Hayes.  Pl.'s Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n") at 5, 7, ECF No. 29; Interrogs. at 4-6.  First, a male of Greek national origin, whose age and protected genetic information are unknown and who served as a Deportation Clerk for ICE, was permitted to transfer from Virginia to New York City due to a medical hardship in his family.  Pl.'s Opp'n at 5; Interrogs. at 4–5.[6]  Second, a male Intelligence Research Specialist, whose national origin, protected genetic information, and age are unknown, was granted a transfer "without formally asking for one" because his wife was experiencing a medical hardship.  Pl.'s Opp'n at 5; Interrogs. at 5.[7]  Third, a female Intelligence Research specialist, whose national origin, age, and protected genetic information are unknown, was approved for transfer from San Diego to Washington, D.C., to join her

---

[6]        Although plaintiff indicated in interrogatory responses that she believed some of these individuals to be under 40 years of age at the time, in briefing she does not rely on that belief, stating only that "year of birth" was "unknown" for each.  *Compare* Interrogs. at 4–5, *with* Pl.'s Opp'n at 5.

[7]        The record does not indicate whether this employee was relocated to be closer to family, closer to medical care, or some other reason.

husband who was serving in the military.  Pl.'s Opp'n at 5; Interrogs. at 5.  Lastly, a female

Intelligence Research Specialist, whose age and national origin are unknown, was granted a

lateral transfer from Columbus, Ohio to Cleveland, Ohio due to a personal medical hardship.

Pl.'s Opp'n at 5; Interrogs. at 6.[8]

### D.    Procedural Background

Plaintiff first initiated contact with an Equal Employment Opportunity counselor within

ICE on November 22, 2011, six days after her transfer request was denied by Mr. Hayes for the

second time, and on March 5, 2012, filed a formal complaint of employment discrimination

against defendant.  Def.'s SMF ¶¶ 47–48; Compl. ¶¶ 9–10.[9]  After defendant completed its

investigation—the outcome of which is not stated in the record—plaintiff requested a hearing

before an administrative law judge ("ALJ") at the Equal Employment Opportunity Commission

("EEOC").  Def.'s SMF ¶¶ 49–50; Compl. ¶¶ 11–13.  During the pendency of the EEOC

proceedings before the ALJ, defendant sought summary judgment, which plaintiff opposed,

Compl. ¶¶ 15–16, but before resolution, plaintiff withdrew her complaint before another ALJ to

whom the case had been reassigned, who in turn dismissed the matter.  Def.'s SMF ¶ 51; Compl

¶ 18.

Plaintiff instituted this lawsuit, on September 29, 2019, in the U.S. District Court for the

District of Maryland, which, on December 6, 2019, granted plaintiff's consent motion to transfer

venue to the District of Columbia.  *See* Pl.'s Consent Mot. Transfer Venue, ECF No. 7; Order,

ECF No. 8.  The scheduling order proposed by the parties and adopted by the Court, along with

two joint motions for extension of the time period for discovery, collectively allowed for over 10

---

[8]      Again here, the record does not indicate the reason for Cleveland being this employee's destination.

[9]      The record is silent as to what, if anything, happened with respect to plaintiff's claim between November 22, 2011, and March 5, 2012.

months of discovery, from July 1, 2020, to May 14, 2021.  *See* Joint Report LCvR 16.3 Conf.,

ECF No. 18; Min. Order (July 1, 2020); Min. Order (Dec. 22, 2020); Min. Order (Apr. 15, 2021).

The parties' briefing on defendant's pending motion for summary judgment was completed in

October 2021, and this motion is now ripe for resolution.[10]

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "A genuine issue of material fact

exists if the evidence, viewed in a light most favorable to the nonmoving party, could support a

reasonable jury's verdict for the nonmoving party."  *Figueroa v. Pompeo*, 923 F.3d 1078, 1085

(D.C. Cir. 2019) (internal quotation marks omitted) (quoting *Hairston v. Vance-Cooks*, 773 F.3d

266, 271 (D.C. Cir. 2014)).  The moving party bears the burden to demonstrate the "absence of a

genuine issue of material fact" in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986),

while the nonmoving party must present specific facts, supported by materials in the record, that

would be admissible at trial and that could enable a reasonable jury to find in its favor, *see*

*Anderson v. Liberty Lobby, Inc.* ("*Liberty Lobby*"), 477 U.S. 242, 248 (1986); *Allen v. Johnson*,

795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, on summary judgment, the appropriate inquiry is

---

[10]     Neither party cited, let alone discussed, the binding decision in *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999), holding that when the allegedly discriminatory action is a forced or denied "lateral transfer," there must be "some other materially adverse consequences affecting the terms, conditions, or privileges of [plaintiff's] employment or [plaintiff's] future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm." Consequently, the Court directed the parties to submit supplemental briefing addressing the effect on plaintiff's claims, if any, of *Brown*, and whether resolution of the instant motion should be stayed pending the D.C. Circuit's rulings in two cases potentially implicating the *Brown* holding: *Chambers v. District of Columbia*, No. 19-7098 (D.C. Cir. argued en banc Oct. 26, 2021), and *Townsend v. District of Columbia*, No. 19-5259 (D.C. Cir. filed Sept. 30, 2019).  Min. Order (Feb. 4, 2022).  On February 18, 2022, the parties filed the requested supplemental briefing, and both posited that this case should be stayed pending resolution of the Circuit cases noted by the Court in its Minute Order.  *See* Def.'s Suppl. Br. ("Def.'s Suppl.") at 2, ECF No. 31; Pl.'s Suppl. Br. Opp'n Def.'s Mot. Summ. J. & Mot. Hold Case in Abeyance ("Pl.'s Suppl.") at 2, ECF No. 32.  Since *Brown* is only one among other reasons for grant of the instant motion, no stay is warranted here.

"whether, on the evidence so viewed, 'a reasonable jury could return a verdict for the nonmoving party'" (quoting *Liberty Lobby*, 477 U.S. at 248)); *see also Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) ("[S]heer hearsay . . . counts for nothing on summary judgment." (internal quotation marks and citation omitted)); FED. R. CIV. P. 56(c), (e)(2)–(3).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011). This evaluation is guided by the related principles that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam), and "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *id.* at 651 (internal quotation marks omitted) (alteration in original) (quoting *Liberty Lobby*, 477 U.S. at 255). Courts "may not make credibility determinations or weigh the evidence," *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 565 (D.C. Cir. 2019) (internal quotation marks and citations omitted), since "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (quoting *Liberty Lobby*, 477 U.S. at 255); *see also Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296 (D.C. Cir. 2015).

The fact that a plaintiff's testimony is uncorroborated is immaterial for purposes of summary judgment, since "[c]orroboration goes to credibility, a question for the jury, not the district court." *Robinson v. Pezzat*, 818 F.3d 1, 9 (D.C. Cir. 2016). Nonetheless, for a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see Equal Rts. Ctr. v. Post Props., Inc.*, 633

F.3d 1136, 1141 n.3 (D.C. Cir. 2011) (citation omitted); *accord* FED. R. CIV. P. 56(e).  If "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  The Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record."  FED. R. CIV. P. 56(c)(3).

Notably, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.  In that situation, summary judgment is properly granted against a party who, "after adequate time for discovery and upon motion, . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

## III.    DISCUSSION

In the discussion that follows, first the applicable legal principles for evaluating a defendant's motion for summary judgment in the employment discrimination context are summarized.  Those principles are then applied to plaintiff's discrimination claims under Title VII, the ADEA, and GINA, to show that, even assuming plaintiff did experience an "adverse employment action" through the denial of her transfer request and can make a prima facie case of discrimination, no genuine dispute of material fact is presented that would allow a reasonable jury to find in plaintiff's favor.  Additionally, under the current law of the D.C. Circuit, the denial of a lateral transfer is *not* an adverse action sufficient to sustain a discrimination claim,

providing an independent ground by which defendants prevail.  For these two independent

reasons, defendants are entitled to summary judgment on all three claims.

### A.      Applicable Legal Principles and Analytical Framework

In a case where plaintiff presents no direct evidence of discrimination, such as "a

statement that itself shows [unlawful] bias in the [employment] decision," *Vatel v. All. of Auto.*

*Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011), a plaintiff may prove discrimination through

circumstantial evidence using the familiar three-part burden-shifting framework of *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973) (Title VII).  *See also, e.g.*, *Ford v. Mabus*,

629 F.3d 198, 201 (D.C. Cir. 2010) (ADEA); *Ortiz v. City of San Antonio Fire Dep't*, 806 F.3d

822, 827 (5th Cir. 2015) (GINA).[11]  "Where there has been an adverse employment action and

the employer asserts a legitimate, non-discriminatory . . . reason for the decision, we focus on

pretext."  *Oviedo v. Wash. Metro. Area Transit Auth.*, 948 F.3d 386, 395 (D.C. Cir. 2020) (citing

*Brady v Off. of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)).  Thus, where an

employer asserts a legitimate, non-discriminatory reason for an adverse employment action, the

"central inquiry" for a court evaluating a defendant's motion for summary judgment becomes

"whether the plaintiff produced sufficient evidence for a reasonable jury to find that the

employer's asserted non-discriminatory reason was not the actual reason and that the employer

intentionally discriminated against the plaintiff on a prohibited basis."  *Id.* (quoting *Iyoha*, 927

F.3d at 566).

In making this assessment at the summary judgment stage, courts may consider relevant

evidence, including but not limited to: "(1) the plaintiff's prima facie case; (2) any evidence the

---

[11]      For the purposes of this motion, plaintiff, the nonmovant, is assumed to establish a prima facie case of
discrimination, as *McDonnell Douglas* nominally requires as a first step, 411 U.S. at 802.

plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer)." *Hampton v. Vilsack*, 685 F.3d 1096, 1100 (D.C. Cir. 2012) (quoting *Waterhouse v. District of Columbia*, 298 F.3d 989, 992–93 (D.C. Cir. 2002)); *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004). The plaintiff need not "submit evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment." *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (citation omitted). Nonetheless, the plaintiff's disagreement with, or disbelief of, the employer's explanation cannot, without more, "satisfy the burden of showing that a reasonable jury could find that the employer's asserted reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Burton v. District of Columbia*, No. 10-cv-1750 (BAH), 153 F. Supp. 3d 13, 58 (D.D.C. 2015), *aff'd sub nom. Nelson v. District of Columbia*, 689 F. App'x 642 (D.C. Cir. 2017) (per curiam).

## B.   Analysis

The parties do not dispute that the record here is devoid of direct evidence of discrimination for plaintiff's three claims under Title VII, ADEA, and GINA and thus that plaintiff must instead prove discrimination through circumstantial evidence using the burden-shifting framework of *McDonnell Douglas*, as simplified by *Brady*. For purposes of this analysis, plaintiff is considered to be a member of a protected class under Title VII, ADEA, and GINA.[12]   She is further assumed to have suffered an adverse employment action, such that she is

---

[12]      Whether the alleged discrimination experienced by plaintiff is covered by GINA is a nuanced question. Under GINA, it is illegal for employers to discriminate against an employee because of the individual's "genetic information." 42 U.S.C. § 2000ff-1(a)(1). In addition to obvious "genetic information" such as information from genetic tests of an employee or a blood relative of such employee, "genetic information" also includes "information

entitled to an inference of discrimination.[13]  Defendant has provided legitimate, non-

discriminatory reasons for denying the transfer request and, consequently, the burden shifts back

to plaintiff to show pretext or, more broadly, that a reasonable jury could find that intentional

discrimination occurred.  Since plaintiff has failed to show pretext and has failed to set forth

facts and arguments that would allow any reasonable jury to find in her favor, defendant's

decision to deny plaintiff's transfer request does not give rise to a viable claim under any of the

three anti-discrimination statutes invoked.

### 1.  Legitimate, Non-Discriminatory Rationale

Defendant identifies three facially non-discriminatory reasons that Mr. Hayes gave for

the denial of plaintiff's transfer request when he considered it—even in the potential absence of a

---

about . . . the manifestation of a disease or disorder in family members of such individual." 42 U.S.C.
§ 2000ff(4)(A)(iii); *see also* 29 C.F.R. § 1635.3(c)(1)(iii).  Courts have interpreted this to mean that, for
discrimination based on family medical history to violate GINA, the family medical condition must have a genetic
predisposition and the employer must have believed that the medical information at issue had a genetic basis.  *See
Tedesco v. Pearson Educ., Inc.*, No. 21-cv-199, 2021 WL 2291148, at *6 (E.D. La. June 4, 2021) (finding father's
suicide could not be considered family medical history because the plaintiff failed to establish a causal link between
his father's suicide and genetic makeup); *Lee v. City of Moraine Fire Dep't*, No. 3:13-cv-222, 2014 WL 1775621, at
*5 (S.D. Ohio May 2, 2014) (finding fact that employee's primary relative had a history of prostate cancer to be
protected under GINA), *adopted*, 2014 WL 2583773 (S.D. Ohio June 9, 2014); *Punt v. Kelly Servs.*, No. 14-cv-
2560, 2016 WL 67654, at *13 (D. Colo. Jan. 6, 2016) (holding the prevalence of breast cancer in the plaintiff's
family to be the type of genetic information implicated by GINA as "the manifestation of a disease or disorder in
family members"), *aff'd*, 862 F.3d 1040, 1052 (10th Cir. 2017); *Jackson v. Regal Beloit Am., Inc.*, No. 16-cv-134,
2018 WL 3078760, at *15–17 (E.D. Ky. June 21, 2018) (concluding family history of colon cancer was genetic
information); *Conner-Goodgame v. Wells Fargo Bank, N.A.*, No. 2:12-cv-3426, 2013 WL 5428448, at *11 (N.D.
Ala. Sept. 26, 2013) (noting that plaintiff's mother's AIDS diagnosis "does not constitute *genetic* information about
a manifested disease or disorder" (emphasis in original)).

Plaintiff disclosed the following facts about her family medical history in her compassionate transfer request: (1) her
mother died from pancreatic cancer; and (2) her father suffered from severe medical conditions including
"unspecified transient cerebral ischemia, pleural effusion, pneumonia, senile dementia, dysphasia, and acute
respiratory failure."  Compassionate Transfer Req. at 1–4.  At least some of this information plausibly is genetic
information covered by GINA.  Assuming, without deciding, that some of the information plaintiff disclosed is
protected under GINA, grants plaintiff the benefit of the assumption that a prima facie case has been shown for all
counts.

[13]        The denial of a requested lateral transfer—that is, a transfer of location without a change in job title,
compensation, benefits, or responsibilities—presents a grey area in the meaning of "adverse employment action."
As discussed further in Part III.C, *infra*, under current D.C. Circuit law, such a denial may not constitute an
actionable adverse employment action.  That rule, however, is under review by the Circuit on rehearing en banc.
For the purpose of the present analysis, it suffices to proceed, *arguendo*, under the assumption that the denial of
plaintiff's transfer *is* an "adverse employment action."

policy requiring him to do so.  *See* Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.") at 14–15,
ECF No. 28.  First, though Mr. Hayes did not dispute the concerning medical condition of
plaintiff's father, he viewed her request as not "demonstrat[ing] a need to permanently relocate"
to New York.  Def.'s Opp'n at 14; Def.'s SMF ¶ 42.  Second, plaintiff had a "stable but
transient" work history because she held many positions in a short amount of time.  Def.'s Opp'n
at 14–15; Def.'s SMF ¶ 43.  Mr. Hayes' concern with this fact counseled against approving the
transfer.  *See* Def.'s Opp'n at 14–15.  Lastly, Mr. Hayes, guided by the needs and purposes of the
New York Field Office, was looking to fill more special agent positions in the office, rather than
adding additional intelligence personnel like plaintiff, because he believed that "intelligence
units in the field had little utility."  Def.'s Opp'n at 15; Def.'s SMF ¶ 44.  All three of these
reasons, if true, fall squarely within the space of reasonable questions a supervisor might
consider when considering whether to invite someone new onto their staff.[14]

    Plaintiff offers less than three pages of milquetoast rejoinders to defendant's trio of
facially reasonable non-discriminatory bases for denying the transfer request.  *See* Pl.'s Opp'n at
8–10.[15]  First, plaintiff asserts that she *did* show a need to permanently relocate back to New
York, noting that she had considered her relocation to Washington as merely a "stepping stone"
for career advancement, *id.* at 8 (quoting Compassionate Transfer Req. at 1–2), and that a

---

[14]    The parties spar at some length over the presence or absence of a compassionate transfer policy covering
plaintiff, a non-law enforcement officer, as though this were a dispositive issue.  *See* Def.'s Mem. at 13; Def.'s SMF
¶ 11; Pl.'s Opp'n at 7–8; Pl.'s Resp. SMF ¶¶ 11–12.  To be sure, this is a genuine dispute of fact, but not a *material*
one.  Even the formal, written policy did not guarantee a transfer to an eligible employee who meets all the relevant
criteria since a discretionary component still applies.  Hardship Policy ¶ 1.2.  Conversely, no party suggests—nor
can they—that the existence of a "policy" is a necessary predicate for a discrimination claim.  Ad hoc actions that
favor or disfavor employees on prohibited grounds are just as actionable.

[15]    Plaintiff also attempts, briefly, to rebut what she views as two other "reasons" offered by defendant for
denying the transfer request: the lack of a written transfer policy and Mr. Hayes's awareness of plaintiff's
performance record.  Pl.'s Opp'n at 7–8.  These arguments are disregarded, however, because defendant does not
present them as among its legitimate, non-discriminatory reasons for the final denial.

doctor's note "stated that her father was not able to take care of himself," *id.* These arguments

fail. Plaintiff's career advancement plans had little to do with the hardship transfer at issue.

Further, despite plaintiff's assertions, the doctor's notes submitted do not allude to permanent

relocation. One said that plaintiff "need[ed] to take *time off* from work to attend [to] the needs of

her ill father." Compassionate Transfer Req. at 6 (emphasis added) (Dr. Cambitsis). The other

indicated that "family involvement [in his care] is essential *at this time*." *Id.* at 8 (emphasis

added) (Dr. Shirwaiker).

Second, plaintiff is incorrect that Mr. Hayes's description of plaintiff's work history as

"stable but transient" is "nonsensical." Pl.'s Opp'n at 9. That phrase is reasonably read to mean

exactly what it says: that plaintiff maintained consistent employment but shifted positions or

roles a number of times over the course of her government tenure. Her resume, requiring

multiple pages to describe roughly a decade of positions held, validates this impression. *See*

*generally* Pl.'s Resume.

Third, plaintiff rejects, without evidence, Mr. Hayes's stated preference for not adding to

the ranks of intelligence employees at the New York office. Pl.'s Opp'n at 9–10. Certainly, the

fact that another employee with an intelligence role was granted a transfer just months after

plaintiff's request was denied muddies the waters. A manager may, however, be persuaded to

flex his staffing preferences to accommodate someone at a higher level who came personally

recommended by a fellow SAC. *See* Def.'s Reply Supp. Summ. J. ("Def.'s Reply") at 5–6, ECF

No. 30; Def.'s SMF ¶ 45. All told, the reasons proffered by the government are "reasonable in

light of the evidence" and not rebutted effectively by plaintiff, and thus there "is no basis for

permitting a jury to conclude that the employer is lying about the underlying facts." *Brady*, 520 F.3d at 495.[16]

### 2. *No Pretext*

The government's showing of non-discriminatory reasons for denying plaintiff's compassionate transfer request shifts back to plaintiff the burden to show that these reasons were a pretextual cover for discrimination. To demonstrate that an employer's proffered non-discriminatory reasons are pretextual, a plaintiff is entitled to offer, *inter alia*, comparator evidence. *Brady*, 520 F.3d at 495. By demonstrating that similarly situated employees were treated differently, an inference can be drawn that plaintiff was treated less favorably on account of his or her protected status. *Id.* To raise such an inference, however, plaintiff must "demonstrate that all of the relevant aspects of [her] employment situation were nearly identical to those of the [other] employee." *Burley*, 801 F.3d at 301 (quotation marks omitted) (second alteration in original) (quoting *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999)). "Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's job and job duties, whether they were [affected] by same supervisor, and, in cases involving discipline, the similarity of their offenses." *Id.*[17] At the summary judgment stage, where a plaintiff relying on comparator evidence fails to produce "'evidence that the comparators were actually similarly situated' to [her], an inference of falsity

---

[16]    Plaintiff's suggestion that defendant's explanations must be rejected *because* they were not contemporaneously documented and therefore are presumptively "*post hoc* rationalizations," *see* Pl.'s Opp'n at 10, is meritless. While contemporaneous documentation is useful evidence for a defendant in an employment discrimination suit, this is not required, and plaintiff has offered only conclusory assertions that the rationales were invented after the fact.

[17]    Though Mr. Hayes was neither a supervisor to plaintiff nor to her comparator, he made the ultimate decision of whether to grant their transfer requests. Plaintiff and one of her proffered comparators were therefore both subject to his "decisional authority." *See Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1116 (D.C. Cir. 2016).

or discrimination is not reasonable," and summary judgment is appropriate.  *Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. Cir. 2008) (quotation marks omitted) (quoting *Waterhouse*, 298 F.3d at 995–96).

Plaintiff has failed to produce evidence identifying any similarly situated employee, and even if her examples did qualify, they do not show discrimination based on a protected characteristic.  As her principal comparator, plaintiff identifies a *single* employee whose transfer request for placement in the New York Field Office was approved by Mr. Hayes.  *See* Interrogs. at 4–6.  This individual, though also an intelligence research specialist like plaintiff, occupied a more senior position.  *Id*.; Def.'s SMF ¶ 45; *cf. Holbrook*, 196 F.3d at 261–62 (senior FBI agent and new agent not similarly situated); *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (associates at different levels in the same law firm not similarly situated).  Mr. Hayes granted the transfer request in light of the comparator's superior credentials and experience.  Def.'s SMF ¶ 46.  Given the different factual circumstances surrounding plaintiff's and the comparator's transfer requests hiring and their different levels of seniority, plaintiff has failed to prove the comparator is similarly situated.

Even assuming, *arguendo*, this individual were similarly situated to plaintiff, the comparator is *also* a female over the age of 40 years old—indeed, over a decade older than plaintiff—and therefore shares protected traits with plaintiff.  *See* Def.'s SMF ¶ 37.  On top of that, the comparator's transfer request was on account of an ailing mother and sister, *id.*; while the record lacks information detailing those ailments, the comparator could have been just as vulnerable to a GINA-offending inference as was plaintiff.  The fact that plaintiff and her comparator are members of the same protected classes weighs against the inference of discrimination as to that attribute.  *See Brown v. Brody*, 199 F.3d 446, 451 (D.C. Cir. 1999)

(finding sex discrimination claim baseless where two of the three employees selected were women); *see also Murray v. Gilmore*, 406 F.3d 708 (D.C. Cir. 2005) (noting that "a replacement within the same protected class cuts strongly against any inference of discrimination"). Furthermore, as noted, the comparator is twelve years *older* than plaintiff, rendering the example altogether useless for plaintiff's ADEA claim.  *See Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 584, 591, 600 (2004) (holding that the ADEA does not prevent an employer from favoring an older employee over a younger one, even when both are in the over-40 protected class).  These facts could not lead a reasonable jury to find that the "employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis."  *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008).

Plaintiff's identification of "[f]our other employees [who] also requested and received compassionate transfers" despite not being law enforcement officers, Pl.'s Opp'n at 5, 7 (citing Interrogs. at 4–6), fares no better.[18]  As an initial matter, nothing in the record suggests that Mr. Hayes was the decision-maker or otherwise involved at all in any of these other cases, limiting their utility as similarly situated comparators.  *See Burley*, 801 F.3d at 301.  Even if they were considered similarly situated to plaintiff, her spartan descriptions of the circumstances pertinent to each person and his or her transfer offer no meaningful support to her discrimination claims.  First, out of these four employees, two were male and two female, Pl.'s Opp'n at 5, so this group adds nothing for a sex discrimination claim.  Second, out of this group the national origin

---

[18]    Defendant notes that when plaintiff mentions these employees in passing when arguing the existence of a *de facto* transfer policy, she does so "without any supporting citations from the record."  Def.'s Reply at 3 (citing Pl.'s Opp'n at 7).  True enough, though in the context of her short (11 pages) opposition memorandum, it is reasonably apparent that she is referring to her enumeration of these employees in her recitation of the factual background, which in turn cites to her own sworn responses to defendant's interrogatories.  *See* Pl.'s Opp'n at 5 (citing Interrogs. at 4–6).

(Greek) is known for only one.  *Id.*  Third, plaintiff does not know the age of any of these four individuals, rendering them useless for the ADEA claim.  *Id.*  Finally, plaintiff indicates that out of these four granted transfer requests, one was due to "the poor health of a family member" and another due to "a personal medical hardship."  *Id.*  Either of those circumstances may be just as supportive of a GINA claim as plaintiff's argument concerning her parents' medical conditions. All told, the only thing these purported comparators show is that defendant from time to time considered transfer requests notwithstanding the lack of a formal policy—just as defendant did for plaintiff.

*   *   *

For all of these protected attributes—sex, national origin, age, and genetic information— the *sole* evidence plaintiff offers that supports her discrimination claim is, in essence, the fact that these characteristics were disclosed in or could be inferred from the text of her transfer request memo.  The conclusory assertion that any discriminatory motive was at play simply cannot create an issue requiring jury resolution.  If it could, then essentially *any* adverse employment action taken against *anyone* could survive summary judgment simply because the employer knew, for example, the sex of the employee.  That result is clearly untenable.

A reasonable jury surely could look at the facts in this case and conclude that ICE's treatment of plaintiff was unkind, lacking in empathy, or unfair.  That same reasonable jury, however, could only reach the conclusion that *these statutes* do not afford plaintiff relief on her threadbare allegations of discrimination.  Summary judgment for defendant must be granted.

### C.    Current Binding Authority Separately Bars Plaintiff's Claims

Plaintiff's claims may also fail for a different reason under Circuit precedent.  An "adverse employment action," a necessary element to a plaintiff's prima facie case, is one that produces "materially adverse consequences affecting the terms, conditions, or privileges of the

20

plaintiff's employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009). In *Brown v. Brody*, the D.C. Circuit held that a plaintiff denied a lateral transfer without a diminution in pay or benefits does not suffer an actionable injury. 199 F.3d at 457. This precedent is currently under en banc review by the D.C. Circuit in *Chambers v. District of Columbia*, No. 19-7098, 2021 WL 1784792 (D.C. Cir. May 5, 2021) (per curiam). Nevertheless, *Brown* is, for the moment, still binding law.

Here, plaintiff has suffered no "objectively tangible harm" under *Brown* because, as a result of the denial of her transfer request, she has not suffered a reduction in pay or benefits, nor any other "consequences affecting the terms, conditions, or privileges of her current or future employment opportunities." *See Forkkio v. Powell*, 306 F.3d 1127, 1130–31 (D.C. Cir. 2002); *see also Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006) (noting that "purely subjective injuries" such as "dissatisfaction with a reassignment, public humiliation, or loss of reputation" do not suffice to make an action "adverse").

Put simply, current binding precedent appears to be fatal to plaintiff's claims and sufficient reason, on its own, to grant summary judgment for defendant. This threshold issue was not mentioned by either party in briefing until the Court expressly directed the parties to address the issue in supplemental briefing, including, *inter alia*, "whether the denial of the transfer plaintiff sought is actionable in light of the rule announced in *Brown v. Brody*," Min. Order (Feb. 4, 2022).[19] The parties' responses show agreement that it is not. Defendant

---

[19]     In *Chambers*, the government is arguing that the *Brown* rule should be altered. Def.'s Suppl. at 2. Given that position, the government would not, perhaps understandably as a policy matter, seek to defeat plaintiff's claims using a legal rule it believes to be wrong. Plaintiff, however, plainly should have disclosed the *Brown* issue, at least if counsel was aware of it. *See* D.C. R. PROF. CONDUCT 3.3(a)(3) ("A lawyer shall not knowingly [f]ail to disclose to the tribunal legal authority in the controlling jurisdiction not disclosed by opposing counsel and known to the

"submits that the denial of the transfer" at issue "*would be* actionable *if* the rule in *Brown v. Brody* . . . is altered in the manner advocated by the United States in *Chambers*."  Def.'s Suppl. Br. at 2, ECF No. 31 (emphasis added).  Plaintiff's response is even more revealing.

Plaintiff's supplemental briefing implicitly concedes this issue altogether.  First, plaintiff indicates that "[t]he disposition of both *Chambers* and *Townsend* will have a direct bearing on [her] Title VII and ADEA claims," and even "asserts that the disposition of *Chambers* will have a direct bearing on her GINA claim as well."  Pl.'s Mem. Supp. Suppl. Br. at 2, ECF No. 32.  That "direct bearing" can mean nothing other than that her claims, while presently dead on arrival, could be resuscitated if the Circuit were to overrule *Brown*.  Second, plaintiff makes no attempt to argue that the *Brown* rule is inapplicable here.  Instead, plaintiff devotes the majority of her supplemental briefing to arguments for why the *Brown* rule conflicts with "[t]he language and objectives of Title VII, along with Supreme Court precedent."  *Id.* at 2–4.  Perhaps it does. Nevertheless, plaintiff effectively concedes that the law of the Circuit as it stands now is an insurmountable obstacle.

This Court must scrupulously respect binding Circuit and Supreme Court precedents. Here, as a matter of common sense the weakness of plaintiff's claims stems from the total dearth of evidence supporting a conclusion of discrimination, not so much from the formalistic classification of the denied transfer as not an "adverse employment action."  Regardless, the Circuit's binding precedent is still binding on this Court—even if under review by the Circuit sitting en banc—and, as such, *Brown* provides a second reason defendant must prevail here.[20]

---

lawyer to be dispositive of a question at issue and directly adverse to the position of the client."); D.D.C. LOCAL CIV. R. 83.15(a) (adopting in this Court the D.C. Rules of Professional Conduct).

[20]    While both parties, after prompting by this Court, submit that disposition of the instant motion should be stayed pending the Circuit's resolution of *Chambers* and *Townsend*,  Def.'s Suppl. at 2; Pl.'s Suppl. at 2, their stay requests are denied as moot since summary judgment in defendant's favor is warranted on other grounds.

**IV.     CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment is GRANTED and

judgment will be entered for defendant.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  March 10, 2022

_____
BERYL A. HOWELL
Chief Judge